IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KRYSTLE RIGSBY,                         )
                                        )
                   Plaintiff,           )
                                        )
vs.                                     )     Civil No.  15-cv-1052-JPG-CJP
                                        )
CAROLYN W. COLVIN,                      )
Acting Commissioner of Social Security, )
                                        )
                   Defendant.           )
                                        )

## MEMORANDUM and ORDER

**GILBERT, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Krystle Rigsby is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).

## Procedural History

Plaintiff applied for benefits on August 17, 2012, alleging disability beginning on October 12, 2011.  (Tr. 13.)  After holding an evidentiary hearing, Administrative Law Judge (ALJ) Jerry Faust denied the application for benefits in a decision dated May 30, 2014.  (Tr. 13-23.)  The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 1.)  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ failed to properly consider his Step Two evaluation.

2.  The ALJ failed to properly consider opinion evidence.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. § 423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit.  20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity.   The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement.  The third step compares the impairment to a list of impairments that are considered conclusively disabling.  If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues.   The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work.  If an applicant can engage in past relevant work, he is not disabled.  The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work.  If the applicant can engage in other work, he

---

[1]  The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined:  (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled….  If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive…." 42 U.S.C. § 405(g).  Thus, this

Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Faust followed the five-step framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since her alleged onset date. He found that plaintiff had severe impairments of obesity, lumbar disc disease with an annular tear, status-post micro lumbar discectomy, status-post anterior lumbar interbody fusion surgery, and right patellofemoral arthritis. (Tr. 15.)

The ALJ found plaintiff had the RFC to perform work at the sedentary level with physical limitations. (Tr. 15-17.) Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff was not able to do her past work. (Tr. 21.) However, she was not disabled because she was able to perform other work that existed in significant numbers in the regional and national economies. (Tr. 22-23.)

## The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

### 1.  Agency Forms

Plaintiff was born on April 25, 1984, and was twenty-seven years old on her alleged onset date.  She was insured for DIB through December 31, 2016.[2]  (Tr. 234.)  She was five feet six inches tall and weighed two hundred and forty-four pounds.  (Tr. 237.)  She completed four years of college in August 2009 and did not require special assistance in school.  (Tr. 238.)

Plaintiff previously worked as a busser in Busch Stadium, a waitress at a restaurant, a student assistant nurse, and a registered nurse.  (Tr. 239.)  Plaintiff claims a herniated disc, depression, anxiety, an annular tear, and pain in her right leg and back limited her ability to work.  (Tr. 237.)  In March 2014, plaintiff was taking ibuprofen and Percocet for pain; Lorazepam, Zoloft, and Buspar for depression and anxiety; and Baclofen as a muscle relaxer. (Tr. 287.)

In October 2012 plaintiff completed a function report.  (Tr. 248-55.)  She stated that her pain began at her lower back and radiated down her right leg.  Her ability to work was limited because her right leg occasionally gave out, she was unable to stoop or bend repetitively, and she had constant pain.  (Tr. 248.)  She had a pet she fed once a day, and her sister helped her take care of the animal.  She indicated she could only sleep for two hours at a time with a sleeping pill and she was constantly tired.  (Tr. 249.)  Plaintiff prepared her own meals but they typically were frozen dinners that she could prepare quickly.  She could wash her own clothes but only had

---

[2] The date last insured is relevant to the claim for DIB, but not the claim for SSI.  *See* 42 U.S.C. §§ 423(c) & 1382(a).

motivation to do her laundry about once a month.  (Tr. 250.)

Plaintiff was capable of shopping in a store for her household items about once a week, but she did not drive because she did not own a vehicle.  She could handle her own finances.  (Tr. 251.)  She read and watched television daily but she slept for a significant portion of her day.  Plaintiff talked on the phone about once every two weeks, attended church on Wednesdays and Sundays, and went to water aerobics classes four times a week.  (Tr. 252.)

Plaintiff claimed she had difficulty lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, using her hands, and getting along with others.  She felt she could lift no more than ten pounds and stand for about ten minutes.  Plaintiff indicated she could not walk more than one block at a time before needing to rest for a few minutes.  She could pay attention for about five minutes at a time and had difficulty following spoken instructions because she was forgetful.  (Tr. 253.)  She had crying spells when she was stressed and had difficulty handling changes in her routine.  She used a walker and a brace on a daily basis to help her walk.  (Tr. 254.)  At the time of submitting her function report, she was taking Lyrica which caused weight gain and depression; Percocet which caused constipation; Valium which caused drowsiness; and Amitriptyline which caused insomnia.  (Tr. 255.)

### 2.  Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on March 7, 2014.  (Tr. 60-59.)  Plaintiff was twenty-nine at the time of the hearing and weighed two hundred and thirty pounds.  She completed a bachelor's degree in nursing in 2009 and had Medicaid.  (Tr. 37.)  Plaintiff worked as a nurse at Barnes Jewish Hospital from 2007 until 2011.  (Tr. 38.)  She stopped working due to pain in her right leg.  (Tr. 39.)

Plaintiff testified that problems with her back caused the pain in her leg.  (Tr. 39-40.)
She had a microdiscectomy[3] performed in 2011 right after she stopped working.  (Tr. 40.)  The
surgery relieved some of her pain for a few months and she attended physical therapy to help as
well.  (Tr. 40.)  She testified that she returned to work in June 2012 as a staff nurse in an
extended care facility.  She could only work for three weeks due to extreme pain.  (Tr. 38.)  In
November 2012 she had a spinal fusion surgery performed.  (Tr. 40.)  She also went to more
physical therapy and a pain clinic.  However, she testified that her pain never improved.  (Tr.
41.)  Plaintiff had a spinal stimulator implanted in her spine and her doctor recommended she
receive a morphine implant.  (Tr. 41.)

Plaintiff stated that on a scale from one to ten her pain was constantly an eight.  It started
at her lower back and radiated down the back of both of her legs into her knees.   Walking,
sitting, standing, twisting, bending, and weather changes caused her pain to become more severe.
She took narcotics daily, and while they helped her from crying she stated they only helped "a
tad bit."  (Tr. 42.)  She used a cane if she had to walk more than a short distance and used a
walker after her surgeries.  (Tr. 42-44.)  She could stand for about ten minutes at a time before
her pain became unbearable.  (Tr. 43.)  She testified that she could sit in a chair for about thirty
to forty-five minutes before she needed to get up and move around.  (Tr. 43-44.)  Plaintiff stated
that if she sat for an hour or two she would be so tired that the rest of the day she would spend
with her knees to her chest lying on a heating pad.  (Tr. 51.)   She never lifted anything heavier
than a gallon of milk and she was able to dress and bathe herself completely.  (Tr. 44.)  She used

---

[3] "The [surgical] procedure to relieve the pressure on a spinal nerve resulting from a herniated lumbar disc is
referred to as a Microdiscectomy. . .  The nerves are gently dissected to expose and visualize the diseased disc.
Depending on the extent of disc herniation, the extruded fragments are freed from the surrounding tissues and
removed, alleviating the pressure on the adjacent nerves.  The objective is not to remove the entire disc, only the
herniated portions that are compressing the exiting spinal nerve." http://www.columbianeurosurgery.org/
specialties/spine/procedures/surgical/microdiscectomy/

a heating pad and an ice pack every day to help relieve pain as well.  She did not sleep well due to pain and worry.  (Tr. 45.)

Plaintiff testified that she spent about seventy-five percent of a typical day lying on the couch or in a recliner chair.  (Tr. 45.)  She took antidepressants and antianxiety medication because of crying spells and feelings of hopelessness.  She could sit through a church service but did not visit with family more than once a month because it caused her pain to increase.  (Tr. 46.)  She drove a car but it caused pain in her leg so her mom drove her to doctor appointments and to the grocery store.  She was able to do her own laundry and went shopping with her mother.  (Tr. 47.)  She no longer read very often and her attention span was short. She did not have any side effects from her medications.  (Tr. 48.)  She received help from the state of Illinois for her mortgage payments and her mother helped her pay for utilities.  (Tr. 49.)

A VE also testified.  The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform sedentary work, but the person could only occasionally lift or carry ten pounds and frequently lift or carry five pounds.  Additionally, the person could sit for a total of six hours in an eight-hour workday, with normal breaks, and stand and walk for a total of two hours in an eight-hour workday.  The individual could occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolds.  Further, the person could occasionally stoop, kneel, crouch, and crawl but must avoid exposure to hazards such as unprotected heights, dangerous machinery, and any commercial driving.  Finally, the person would need to alternate between sitting and standing positions every ninety minutes.  (Tr. 53-54.)

The VE testified that the individual could not perform any of plaintiff's previous work.  However, the person could perform other jobs that exist in a significant number within the

8

national and regional economies.  Examples of such jobs are hand packer, production worker assembler and surveillance system monitor.  The VE stated that alternating between sitting and standing would reduce the amount of available jobs by fifty percent.  (Tr. 54.)  Further, if the person needed a cane while standing it would interfere with the number of available positions. (Tr. 56.)  The VE also testified that if the person missed two or three days a month, or was off task for fifteen percent or more of the workday, there would be no available jobs in the national or regional economies.  (Tr. 55.)

### 3.  Medical Treatment

Plaintiff's medical records are extensive.  While the Court has reviewed the entire record, this opinion will focus primarily on the portions of the record applicable to plaintiff's brief and the ALJ's opinion which focus primarily on plaintiff's back and mental issues.

Plaintiff had three back surgeries on record.  Plaintiff had her first back surgery in November 2011, when she had a lumbar microdiscectomy performed at L5-S1.  (Tr. 484.) Plaintiff's next back surgery occurred in September 2012 when she had an autologous iliac crest bone graft[4] and retroperitoneal[5] radical discectomy at L5-S1.  She also had BAK instrumentation[6] and fusion at L5-S1 to treat the collapse of the disc.  (Tr. 728.)  In December 2012, plaintiff had a CT scan of her lumbar back performed to evaluate the effects of the surgery.   The scan

---

[4] "Autograft (sometimes referred to as autologous bone or autogenous bone graft) is taken from the patient and transferred to the portion of the spine to be fused.  During the spinal fusion surgery, a separate surgical procedure is conducted to remove bone from another part of the patient's body and place it in the area of the spine to be fused. This is a surgical process called 'harvesting' the bone graft.  This procedure is usually done through a same incision in posterior fusions and through a separate incision on anterior fusions.  Bone is usually harvested from one of the patient's bones in the pelvis (the iliac crest)."  http://www.spine-health.com/treatment/spinal-fusion/autograft-patients-own-bone.

[5] Retroperitoneal refers to "the space between the peritoneum and the posterior abdominal wall that contains especially the kidneys and associated structures, the pancreas."  https://www.merriam-webster.com/medical/retroperitoneum.

[6] BAK instrumentation refers to an interbody fusion cage designed by Bagby and Kuslich.  "Interbody cages are titanium cylinders that are placed in the disc space.  The cages are porous and allow the bone graft to grow from the vertebral body through the cage and into the next vertebral body.  The cages offer excellent fixation, so most patients do not need additional instrumentation or post-operative back braces for support."  http://www.spine-health.com/treatment/spinal-fusion/interbody-cages-spine-fusion.

indicated evidence of interval fusion of L5-S1 with anterior plate and screws.  Two BAK intradiscal cages were present, and there was no evidence of loosening.  (Tr. 1023.)  There was multilevel mild spondylosis of the lumbar spine without evidence of significant spinal canal or neural foraminal narrowing at any level.  (Tr. 1024.)  Plaintiff reported extreme discomfort in January 2013, but the examiner was unsure as to why.  (Tr. 770.)  Plaintiff's final back surgery occurred in June 2013 when she had a microscopic T10 laminotomy[7] with dorsal column stimulator implanted as well as two peripheral leads and a left-sided IPG.[8]  (Tr. 1349.)

Plaintiff frequently reported severe back pain, even after her surgeries.  (*E.g.*, Tr. 1105, 1186, 1213, 1439, 1452.)  For the entirety of plaintiff's record she regularly sought treatment from her primary care physician, Dr. Julie Buchner.  (Tr. 387-555, 766-1008, 1026-60, 1439-91.)  Dr. Buchner attempted to change plaintiff's medications several times, but very few changes seemed to help.  She was prescribed several strong narcotic drugs like Nucynta, Percocet and morphine in the form of Opana in order to help her pain.  (*E.g.*, Tr. 402, 411, 846, 1078, 1188, 1314-15, 1333.)

Dr. Buchner recommended plaintiff receive treatment from the pain institute, and she underwent several rounds of steroid injections to help with the pain.  (Tr. 363, 370, 375, 381, 1184, 1196, 1197, 1199, 1487.)  She did not see much improvement from the injections and several providers were unsure why the treatments were not helping.  (Tr. 118, 1451.)  Plaintiff also went to physical therapy to help minimize her pain.  (Tr. 338, 769, 781, 1190-93, 1207.)

Plaintiff's record also indicates she had a history of mental health issues.  In September

---

[7] A laminotomy is "[a] procedure for treating herniation of an intervertebral disc, consisting of removing a portion of the superior and inferior aspects of the lamina adjacent to the diseased disc."  http://medical-dictionary. thefreedictionary.com/laminotomy.

[8] An implantable pulse generator, or an IPG, "is a battery-powered micro-electronic device, implanted in the body, which delivers electrical stimulation to the nervous system.  An essential part of surgically implanted systems designed to treat a wide array of conditions, the IPG delivers very small pulses of electricity to block or stimulate nerve signals (or impulses), depending upon the condition."  https://www.mdtmag.com/article/2012/01/implantable-pulse-generators-stimulate-medical-device-industry.

2011 plaintiff was first diagnosed with depression by Dr. Buchner.  (Tr. 411.)  Thereafter, her treatment notes indicate she was regularly diagnosed with symptoms of depression and anxiety by Dr. Buchner.  (*E.g.*, Tr. 398, 1452, 1446.)  Several of plaintiff's providers on record indicated they were unsure if the pain plaintiff complained of was actually real, or if she had a mental issue that made her feel she had more pain.  (*E.g.*, Tr. 1063, 1137, 1186, 1455.)  One of plaintiff's providers at the pain institute indicated that plaintiff's mental stability was in question.  (Tr. 1186.)

Plaintiff also frequently saw Dr. William Thom at Associated Physicians Group.  (Tr. 1094-1326.)  Dr. Thom recommended plaintiff receive the spinal cord stimulator due to her lack of response to conservative treatment.  He also recommended she participate in the STEPP program[9] to "better address psychological factors related to her chronic pain and lifestyle change."  (Tr. 1127.)  Dr. Thom opined that plaintiff had chronic pain syndrome, chronic pain associated with significant psychosocial dysfunction, and pain associated with psychological factors.  (*E.g.*, Tr. 1130, 1135, 1140, 1146.)  Dr. Thom stated plaintiff had a great deal of anxiety and there was a definite psychological component to her symptoms.  (Tr. 1137, 1143.)

In March 2013, plaintiff had a psychiatric evaluation with psychiatrist Dr. Hetal Amin prior to her neurostimulator implant.  (Tr. 1085-87.)  Dr. Amin stated plaintiff's mood and affect were tired and her memory was impaired.  He felt plaintiff's prognosis was guarded and he diagnosed "rule-out major depressive disorder and rule-out depressive disorder secondary to medical condition."  (Tr. 1087.)

In April 2013, plaintiff underwent three psychotherapy sessions with Mary Lutz, MSW.  (Tr. 101-63.)  Ms. Lutz opined that plaintiff's sustained concentration and persistence were

---

[9] The STEPP program is a cognitive behavioral approach to pain management and it teaches patients to live life with chronic pain.

reduced which was possibly a result of her pain level and uncertainty about her ability to fulfill job requirements in the future. (Tr. 1063.) Later that month, plaintiff was admitted to the hospital overnight due to histrionics accompanying lower back pain. (Tr. 1454.) The doctor at the hospital stated that plaintiff had severe back pain with skeletal and myofascial causes but with strong emotional overlay. (Tr. 1455.)

### 4. Opinion of Treating Physician

Plaintiff's primary care physician, Dr. Buchner, completed an assessment of plaintiff's capabilities in February 2014. (Tr. 1483-84.) Dr. Buchner opined that plaintiff could not perform sustained lifting and carrying, and she could not stand or walk more than two hours in an eight-hour workday. Dr. Buchner indicated plaintiff could sit for at least six hours in an eight-hour day but she would need to alternate between standing and sitting every ninety minutes. Plaintiff had no limitations with the use of her upper extremities, but her pain level would frequently interfere with her ability to maintain attention and concentration. Additionally, plaintiff could need more than three hours of rest in an eight-hour workday. (Tr. 1483.) Dr. Buchner stated that plaintiff's upper back pain, lower back pain, hip pain, and pain that radiated down her right leg were plaintiff's current problems. She indicated, however, that her neurosurgeon should be the one that provides information on these diagnoses. She also stated that she believed plaintiff could engage in sedentary work. (Tr. 1484.)

### 5. RFC Assessments

Plaintiff's mental RFC was assessed by state agency psychologist Howard Tin in December 2012. (Tr. 60-64.) He reviewed plaintiff's records but did not examine plaintiff in person. Dr. Tin opined that plaintiff had severe disorders of the back and non-severe affective disorders. He noted plaintiff had a diagnosis of depression due to a general medical condition

and that her statements regarding those symptoms were considered credible.  (Tr. 63.)  He indicated plaintiff had mild restrictions on her activities of daily living and maintaining social functioning.  He also opined that plaintiff had no limitations in concentration, persistence, or pace and stated that plaintiff had no repeated episodes of decompensation on record.  (Tr. 64.)

Plaintiff's mental RFC was also assessed by state agency psychiatrist Donald Henson in May 2013.  (Tr. 81-86.)  He also did not examine plaintiff in person.  Dr. Henson indicated plaintiff had severe disorders of the back and non-severe affective disorders.  (Tr. 85.)  He opined that plaintiff had mild restrictions on her activities of daily living and mild difficulties maintaining social functioning.  He also stated that plaintiff had no difficulties in concentration, persistence, or pace, and had no repeated episodes of decompensation.  (Tr. 86.)

Plaintiff's physical RFC was assessed by state agency physician Julio Pardo in December 2012.  (Tr. 65-68.)  He reviewed plaintiff's records but did not examine plaintiff in person.  Dr. Pardo indicated plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds.  (Tr. 65.)  Plaintiff could stand, walk, or sit for six hours out of an eight-hour workday.  Dr. Pardo stated that plaintiff's back surgeries caused limitations but that her most recent examinations indicated she had strength and could be expected to perform a wide range of light activities.  Dr. Pardo opined that plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  (Tr. 65.)  Further, plaintiff could occasionally balance, stoop, kneel, crouch, and crawl.  (Tr. 65-66.)

Plaintiff's physical RFC was also evaluated by Dr. C.A. Gotway in May 2013.  (Tr. 86-90.)  He opined that plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds.  Plaintiff could stand, walk or sit for six hours out of an eight-hour workday. (Tr. 87.)  Dr. Gotway stated plaintiff could occasionally: climb ramps, stairs, ladders, ropes and

scaffolds; balance; stoop; kneel; crouch; or crawl.  (Tr. 88.)

### 6.  Consultative Examination

State agency internist Vittal Chapa, M.D., performed a consultative examination on plaintiff in December 2012.  (Tr. 760-65.)  Dr. Chapa noted plaintiff arrived at the examination with the help of a walker.  He stated she could ambulate up to fifty feet on a flat surface without the walker, but she had an antalgic gait and she was complaining of back pain.  (Tr. 761.)  Plaintiff's right ankle reflex was absent, her left ankle reflex was 1+, and her knee reflexes were 1+ bilaterally.  Dr. Chapa observed that plaintiff had moderate paravertebral muscle spasms.  He could not test her lumbosacral spine flexion because she had a recent back surgery and she was told not to bend.  She had full range of motion in all other joints.  Dr. Chapa's diagnostic impression was chronic lumbosacral pain syndrome.  In Dr. Chapa's summary he stated that plaintiff took pain medications, she was receiving physical therapy, and she wore a back brace.  (Tr. 762.)

### Analysis

Plaintiff argues that the ALJ failed to appropriately consider her mental impairments and her spinal cord stimulator when he completed step 2 of the sequential evaluation process.  She also contends that he failed to appropriately weigh the medical opinions on record.

The Court will begin with plaintiff's second argument that the ALJ failed to appropriately weigh the medical opinions on record.  Plaintiff first contends that the ALJ did not adequately consider the opinion of Dr. Buchner.  The ALJ is required to consider a number of factors in weighing a treating doctor's opinion.  The applicable regulation refers to a treating healthcare provider as a "treating source."  The version of 20 C.F.R. § 404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u>

(emphasis added).

A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record.  *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).   Supportability and consistency are two important factors to be considered in weighing medical opinions.  In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record."  *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010) (citing § 404.1527(d)).

Here, the ALJ gave plaintiff's treating physician's opinion significant weight, stating that the opinion was consistent with the record as a whole.  He notes that Dr. Buchner opined that plaintiff could perform sedentary work and that she could not perform sustained lifting and carrying.  However, as plaintiff notes, he fails to mention that a significant portion of Dr. Buchner's opinion refutes the idea that plaintiff could perform competitive work.  For example, Dr. Buchner stated that plaintiff could need up to three hours of rest a day and her pain level would frequently interfere with her ability to maintain attention and concentration.  (Tr. 1483.)

As plaintiff notes in her brief, the consultative examiner testified that an individual could

not maintain competitive employment if they were off task at work more than fifteen percent of the time.  (Tr. 55.)  Three hours off task is significantly more than fifteen percent of the day.  Since the ALJ gave the opinion significant weight, he had a duty to address the portions of the opinion that were contradictory to his final analysis.  He was not required to give the opinion weight, but he was required to form a logical bridge to his opinions.  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

As plaintiff notes, it seems the ALJ relied on the portion of Dr. Buchner's opinion that indicated she felt plaintiff could perform sedentary work.  However, the ALJ dismissed Dr. Buchner's opinion from 2012 that stated plaintiff was unable to work because "whether the claimant can work is an issue reserved to [the] Commissioner of Social Security." (Tr. 21.)  The reason that this issue is reserved for the Commissioner and that doctor's opinions are not to be given special significance is that doctors may not be aware that an individual cannot maintain employment if they are off task more than fifteen percent of the day.   20 C.F.R. § 404.1527(d)(3).  The ALJ was required to look beyond the statements of whether Dr. Buchner felt plaintiff could or could not work and focus on the functional limitations she discussed.  The ALJ's failure to do this is error.

Plaintiff also takes issue with the ALJ's reliance on the state agency medical consultants.  "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  Social Security Ruling 96-6p, at 2.  The ALJ is required by 20 CFR §§ 404.1527(f) and 416.927(f) to consider the state agency physicians' findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight

given to the opinion in his decision.  *Id.*

The ALJ gave the opinions of Drs. Pardo and Gotway significant weight.  Drs. Pardo and Gotway opined that plaintiff could perform light work.  The ALJ stated that, although his RFC assessment was more restrictive than those of the consultants, the ability to perform light work also includes the ability to perform sedentary work.  (Tr. 21.)  Plaintiff contends that this is illogical.  The Commissioner argues that this falls under the harmless error analysis and that if the ALJ would have reached the same result without the error, the reasoning should stand.  *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).  The ALJ's restrictions within the RFC seem to mirror some of the restrictions established by Dr. Buchner more so than the state agency physicians.  For example, the sit stand option suggested by Dr. Buchner was fully adopted in the RFC.  Therefore, this Court agrees with the Commissioner that if the ALJ had rejected the state agency physician opinions he would have reached the same conclusion, and his error did not prejudice plaintiff in any way.

Plaintiff also argues that the ALJ failed to give weight to the opinion of state agency physician Dr. Tin.  Dr. Tin noted plaintiff had a diagnosis of depression due to a general medical condition and that her statements regarding those symptoms were considered credible.  (Tr. 63.)  He indicated plaintiff had mild restrictions on her activities of daily living and maintaining social functioning.  (Tr. 64.)  Plaintiff contends that this analysis indicates Dr. Tin believed plaintiff's allegation that she could only pay attention for five minutes and that his diagnosis of depression was consistent with the diagnosis of pain disorders related to psychological factors.  Dr. Tin's opinion states that he believed plaintiff's "statements regarding symptoms are considered credible."  (Tr. 63.)  He did not specify which statements, and he stated that plaintiff had no limitations in concentration, persistence, or pace.  (Tr. 64.)  As the Commissioner notes, while

Dr. Tin determined plaintiff's depression was medically determinable, he found it was not severe.  (Tr. 63.)  Dr. Tin found plaintiff's depression did not limit her ability to perform basic work functions.  (Tr. 63-64.)  Therefore, this Court rejects the argument that the ALJ's failure to discuss Dr. Tin's opinion serves as a basis for remand.

Finally, the Court will look at plaintiff's first argument that the ALJ did not appropriately consider all of her impairments during his step two evaluation.  As previously stated, the Seventh Circuit has noted that the "second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement." *Craft*, 539 F.3d at 673.  An impairment is considered "severe" if it significantly limits a claimant's ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(a).

At the ALJ's step two determination, he found plaintiff to have the severe impairments of obesity, lumbar degenerative disc disease with an annular tear, status-post micro lumbar discectomy, status-post anterior lumbar interbody fusion surgery, and right patellofemoral arthritis.  (Tr. 15.)  Plaintiff first argues that the ALJ erred when he determined that her mental impairments were not severe.

In order to evaluate the severity of mental impairments, ALJ's apply a special technique where they rate a claimant's functionality in the areas of (1) activities of daily living; (2) concentration, persistence, or pace; (3) social functioning; and (4) episodes of decompensation. *See* 20 C.F.R. § 404.1520(d).  A claimant's mental impairment is considered not severe if an ALJ finds the claimant has mild or no limitations in the first three areas as well as no episodes of decompensation.  *Id*.

As the Commissioner notes, plaintiff has the burden of establishing that her mental impairments were severe.  20 C.F.R. § 404.1512.  Plaintiff notes her long history of mental

health treatment, with diagnoses of depression, anxiety, and psychological components to her pain. The Commissioner argues that the general diagnoses of these illnesses do not establish a severe mental impairment. However, this Court agrees with plaintiff that the ALJ could not have properly considered plaintiff's credibility or RFC without considering the relationship between plaintiff's physical pain and her perceived pain. The ALJ fails to mention plaintiff's depression, anxiety, or perceived pain at all beyond step two. As plaintiff notes, the Seventh Circuit has stated,

> Pain is always subjective in the sense of being experienced in the brain. The question whether the experience is more acute because of a psychiatric condition is different from the question whether the applicant is pretending to experience pain, or more pain than she actually feels. The pain is genuine in the first, the psychiatric case, though fabricated in the second. The cases involving somatization recognize this distinction. *Metz v. Shalala,* 49 F.3d 374, 377 (8th Cir.1995); *Latham v. Shalala, supra,* 36 F.3d at 484; *Easter v. Bowen, supra,* 867 F.2d at 1129. The administrative law judge in our case did not. . . What is significant is the improbability that [the claimant] would have undergone the pain-treatment procedures that she did, which included not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits. . . He failed to take seriously the possibility that the pain was indeed as severe as [the claimant] said but that its origin was psychological rather than physical.

*Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).

The case at hand is extremely similar. Plaintiff underwent several back surgeries, steroid injections, pain management, and took strong drugs with little to no help. The ALJ noted that even though plaintiff's symptoms seemed genuine the surgeries were successful. (Tr. 19.) This indicates that the ALJ failed to even consider that plaintiff's pain could have been psychogenic in nature. This is error.

Plaintiff also notes that the ALJ failed to mention her third back surgery, the laminotomy to implant a spinal cord stimulator. The Commissioner notes that the ALJ "is not required to

discuss every piece of evidence but is instead required to build a logical bridge from the evidence to [his] conclusions." *Simila*, 573 F.3d at 516.  Plaintiff does not argue that the ALJ's failure to include this surgery requires reversal.  However, the ALJ's failure to even mention the third surgery is indicative of a line reasoning that fails to appropriately discuss evidence that does not support his conclusions.  This is also error.  The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

An ALJ must build a logical bridge from evidence to conclusion.  "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner*, 697 F.3d at 646 (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).  Here, the ALJ did not appropriately weigh the medical opinions and failed to thoroughly consider all of plaintiff's medically determinable impairments.

Because of the ALJ's errors in evaluating the medical opinions on record and plaintiff's step two impairments, the case must be remanded.  The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Krystle Rigsby's application for DIB and SSI is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATED:  January 25, 2017**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**